(C.D. 2670)

WILLIAM ADAMS, INC. *v.* UNITED STATES

430

United States Customs Court, First Division

(Decided May 5, 1966)

*Siegel, Mandell & Davidson* (*David Serko* and *Allan H. Kamnitz* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Mollie Strum,* trial attorney), for the defendant.

Before OLIVER and NICHOLS, Judges, and WILSON, Senior Judge;
NICHOLS, J., concurring

OLIVER, Judge: The above-enumerated protests, consolidated at trial, cover entries of various glass articles which were classified by the collector under paragraph 218(f) of the Tariff Act of 1930, as modified by T.D. 51802 and T.D. 51898, as household or table articles dutiable at 50 cents on each article, but not less than 30 per centum nor more than 50 per centum ad valorem.

Plaintiff contends, alternatively, that the merchandise is classifiable as manufactures of glass, not specially provided for, under paragraph 230(d) of said act, as modified by T.D. 52739, and dutiable thereunder at 25 per centum ad valorem, or as articles, other than household, table, or kitchen articles, dutiable at the reduced rate of 30 per centum ad valorem under paragraph 218(f), as modified by T.D. 53865 and supplemented by T.D. 53877.

The record in the case of *William Adams, Inc.* v. *United States,* 51 Cust. Ct. 126, C.D. 2419, was incorporated herein (R. 2). The mer-

chandise and claims being the same, this case amounts to a retrial of our first *William Adams* decision, *supra*.

It was stipulated by the parties, as it was in the first *Adams* case, that the imported glassware is not bubble glass, that it is pressed and polished, and that it was decorated in the mold, but not blown or partly blown in the mold (R. 4). Further, it was agreed that the exhibits in the previous case would be referred to by the same exhibit numbers given to them in that case (R. 6, 7).

The assessed and claimed tariff provisions involved read as follows:
Assessed:

Paragraph 218(f), Tariff Act of 1930, as modified by T.D. 51802 and T.D. 51898:

Table and kitchen articles and utensils, * * * composed wholly or in chief value of glass, blown, or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except for such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sandblasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free (except articles primarily designed for ornamental purposes, decorated chiefly by engraving and valued at not less than $8 each):
 If commercially known as bubble glass and produced otherwise than by automatic machine (except articles cut or engraved and valued at not less than $1 each) _____ 30% ad val.
 Christmas tree ornaments_____ 50% ad val.
 Other _____ 50¢ on each article or utensil, but not less than 30% nor more than 50% ad val.

Claimed:

Paragraph 230(d), Tariff Act of 1930, as modified by T.D. 52739:

All glass, and manufactures of glass, or of which glass is the component of chief value, not specially provided for (except broken glass or glass waste fit only for remanufacture, and except pressed building blocks or bricks, crystal color, and pressed and polished but undecorated wares) _____ 25% ad val.

or in the alternative:

Paragraph 218(f), as modified by T.D. 53865, supplemented by T.D. 53877:

All articles (not including table and kitchen articles and utensils) of every description not specially provided for, composed wholly or in chief value of glass, blown

or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sandblasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free:

Christmas tree ornaments valued under $7.50 per gross _____ 40% ad val.

Other, valued not over $1.66⅔ each (except Christmas tree ornaments, household articles, and articles and utensils commercially known as bubble glass and produced otherwise than by automatic machine; and except articles and utensils blown or partly blown in the mold or otherwise and cut or engraved and valued at $1 or more each) _____ 30% ad val.

We noted in the previous case, and we repeat that observation here, that paragraph 218(f), via trade agreement modification, presently excepts from the lower duty rate of 30 per centum ad valorem all table, kitchen, and household articles. Therefore, if the involved merchandise consists of any of these articles, the collector's classification should be upheld.

The merchandise in the first *Adams* case, as here, consisted of invoice items identified as D–1, D–4–A, D–5, D–6, and D–9. We had before us samples of three of those items, namely, a glass dish, items D–1 and D–6 (plaintiff's exhibits 1 and 2) and a glass plate, item D–4–A (plaintiff's exhibit 3). Each item was decorated with a "star" pattern. There were no samples for items D–5 and D–9, although they were said to be of the same quality, differing slightly in shape. For all the imported items there, as well as here, the most significant feature was the presence of a small hole, approximately one-eighth of an inch in diameter, drilled through the bottom at the center and serving as a means for fitting metal bases or other attachments.

The testimony of plaintiff's main witness in that case, Mr. Jack Landes, was summarized by us as follows:

The president of the plaintiff corporation, an importer and a manufacturer "of sterling plated and combinations of crystal and silver articles," testified that the imported items, with the hole drilled therein, are not usable as imported, and that they are never sold to consumers in such condition. He stated that the bulk of plaintiff's business is in the silverware trade and that the glassware in question is mainly combined with silverplate. Explaining how plaintiff sells the present merchandise to the retail trade—department stores, various retail outlets dealing in "giftware of all sorts and silverware and jewelry

stores" (R. 14)—the witness stated that the dish, exhibit 1, *supra*, is combined either with a small metal base and handle (defendant's illustrative exhibit B) for use as a candy compote, or in combination with a larger dish and fitted with a handle to become a 2-tier dish. Mention was also made of the combination of the same article "with a nozzle of a candlestick to use this as a table console stick." (R. 16.) The dish, exhibit 2, *supra*, has a silverplated base (defendant's illustrative exhibit A) attached thereto for its use as "a center piece for fruit" (R. 17), or as "a bowl for any sort of purposes so desired." (R. 22.) The plate, exhibit 3, *supra*, has a silverplated base (defendant's illustrative exhibit A) attached thereto and "sold for a cake plate in this manner" (R. 19), or it is fitted with a handle "to make it an hors d'oeuvre dish" (R. 17), and it is also used in combination with another item in controversy, D–9, to make a 2-tier dish.

Plaintiff's other witness, in the previous case, testified along similar lines with respect to glass articles, which he imported, similar to the involved merchandise but containing larger holes and sold to various retailers in combination with metal bases.

Plaintiff's main contention was that the imported merchandise consisted of unfinished articles and that, since paragraph 218(f), as modified, did not provide for such partly finished or unfinished articles, the imported glassware was excluded therefrom and properly classifiable as manufactures of glass in paragraph 230(d), as modified. We held that plaintiff's position was untenable in light of the decision of our appellate court in *Waltham Watch Co.* v. *United States (Jaeger Watch Co., Inc., Party in Interest)*, 25 CCPA 330, T.D. 49425, and cited our decision in *Norge Division, Borg-Warner Corp.* v. *United States*, 44 Cust. Ct. 121, C.D. 2164, commenting on the *Waltham* case as follows:

In its decision in the *Waltham Watch Co.* case, *supra*, our appellate court pointed out that previously decided cases had established the principle that an unfinished imported article may be classified under an *eo nomine* provision for the article where it appeared that the imported article had reached a form and stage where it was fit for no other useful purpose than as such article. The court considered the fact that some tariff provisions specifically provided for articles in a "finished or unfinished" state or used equivalent language, while other provisions of the tariff did not contain such a description, and determined that the omission of such language in connection with any tariff designation did not compel the conclusion that only completely finished articles were covered thereby.

In making this determination, the court considered the ease of avoidance of the higher duties on articles specifically named in the tariff act by the omission of a small but essential part of such articles, and the effect on the dutiable and free schedules of a rigid adherence to a requirement for completeness and absolute finish of the articles covered by tariff designations.

Based on the record before us, we found that the articles had been subjected to a series of processes identifying them and committing them to use as table or household articles and were, therefore, dutiable as assessed under the doctrine of the *Waltham* decision.

In the present litigation, besides incorporating the record in the previous case, plaintiff introduced additional testimony from its witness, Mr. Jack Landes, and offered in evidence exhibits 8 through 17, which were admitted as representative samples of the complete article as sold to customers at retail (R. 46, 47). In each instance, it was agreed that it was only the glass portion of each such exhibit that was imported and, therefore, in dispute. Since the identity of these exhibits and what they represent is not challenged, we will set forth herein a tabulation of said exhibits, as appears in plaintiff's brief pages 8–9:

1. Exhibit 8—a glass fruit bowl center piece or salad bowl (R 30) composed of a D–5 bowl with a base.
2. Exhibit 9—a chip and dip dish, consisting of a D–4 plate (Exhibit 3) and D–9 bowl (R 11).
3. Exhibit 10—a centerpiece composed of D–6 (Exhibit 2) (R 19).
4. Exhibit 11—a caviar dish consisting of a D–6 (Exhibit 2) and a D–9 (R 20).
5. Exhibit 12—a two-tier hors d'oeuvre dish consisting of a D–4 (Exhibit 3) and a D–11 (not in issue in this case) (R 20).
6. Exhibit 13—a flower and fruit centerpiece consisting of D–6 (Exhibit 2) and a glass vase (not in issue in this case) (R 21).
7. Exhibit 14—a candle stick containing two D–1's (Exhibit 1) (R 21).
8. Exhibit 15—a cake plate consisting of a D–4 (Exhibit 3) (R 22).
9. Exhibit 16—a powder or candy box consisting of a D–9 and a glass cover (not in issue in this case) (R 23).
10. Exhibit 17—a candy compote consisting in part of D–1 (Exhibit 1) (R 23).

Each exhibit is made up of one or two glassware items assembled in combinations with various shaped metal bases or metal bases with metal columns attached. The bases are attached by means of a metal screw passing through a hole in the center of the glassware. The attachment is sealed with a plastic washer. The columns screw onto the base and through the glassware to form a two-tier arrangement. Plastic washers also seal these attachments.

Mr. Landes, president of the importing firm, testified that, prior to 1958, the complete assemblies were imported from England. Since that time, they have procured the glass items separately from Belgium, where they are specially manufactured with the holes drilled in them. Some of the bases are now purchased domestically, while others are still imported.

The witness also stated that the metal bases used with the imported merchandise are either silver plated or gilded brass, the value of which is substantial and sometimes, depending upon the particular base and glass combination, it predominates (R. 42–45).

Plaintiff argues here, based on the additonal record before the court, that the imported articles form but parts of completed table or household articles and, there being no provision in paragraph 218(f), as modified, for "parts of table or household articles," they are not capable of classification within this carved-out provision. Plaintiff also maintains that the principle enunciated in the *Waltham* case, *supra*, has no application to a use provision, citing previous decisions by this court recognizing that such modified provision in paragraph 218(f) is a use designation.[1]

The "parts" argument, made in the previous case, is stressed here. Plaintiff emphasizes, by use of additional oral and demonstrative evidence, the nature and function of each wholly manufactured unit in the assembled products offered at retail. In reviewing the records of both the present case and the incorporated case and particularly in view of the representative samples of the completed consumer articles contained in plaintiff's exhibits 8 through 17, we are persuaded to depart from our decision in the first *Adams* case, *supra*, and to find that the imported glassware items do function as "parts" only of what concededly are table and household articles.

Exhibits 8 through 17 aid in illustrating that the imported merchandise consists, not of unfinished glass table and household articles requiring some further steps of manufacture for completion, as was the nature of the merchandise in the *Waltham* case, *supra*, but, rather, that they are wholly manufactured articles designed for and actually assembled with substantial components of base metal, plated or gilded. The various table and household articles offered for public consumption are more accurately described as glass and silver plated (and/or gilded) brass wares. The evidence establishes that the metal and glass sections are sold in combinations with each other; that each is designed and dedicated for use with the other; and that the value of the completed article is substantially affected by the presence of each part. While it may be true that the glass items, standing alone, can be considered capable of some household use, such capability of use would not represent their ordinary or principal use. *United States* v. *The Baltimore & Ohio R. R. Co. a/c United China & Glass Company*, 47 CCPA 1, C.A.D. 719. The representative samples themselves, as well as the uncontradicted evidence of how they are uniformly sold and the

---

[1] *Ace Importing Co., Inc.* v. *United States,* 44 Cust. Ct. 468, Abstract 64185 ; *Frank P. Dow Co. et al.* v. *United States,* 46 Cust. Ct. 477, Abstract 65614 ; *M. Pressner & Co.* v. *United States,* 49 Cust. Ct. 221, Abstract 67019.

effect of each component on the sale price are strong indications of ordinary usage. The presence of a hole, albeit one-eighth of an inch in diameter, in the center of each glass item suggests that, if the glass alone were to be chiefly used, other articles of relatively less cost and without such holes would be purchased instead.

As stated above, we are now persuaded that the imported glassware items are not unfinished household articles but represent finished parts of independent consumer articles. A part of an article connotes a portion of a thing described and is distinguishable from the thing itself in an unfinished or incomplete state. *Jack Schaefer, Inc.* v. *United States*, 11 Cust. Ct. 78 C.D. 798; *Roberts Mfg. Co.* v. *United States*, 6 Cust. Ct. 259, C.D. 477; *The May Co.* v. *United States*, 64 Treas. Dec. 295, T.D. 46650. Judicial constructions of the tariff term "household utensils" in paragraph 339 of the 1930 Tariff Act lend support to the position we have taken.

In *John L. Westland & Son, Inc.* v. *United States*, 35 Cust. Ct. 292, Abstract 59419, the court had before it certain metal sink strainers conceded to be chiefly used in the household by being placed in kitchen sinks and serving as strainers and/or stoppers. In denying plaintiff's claim for classification as household utensils under paragraph 339, the court rendered the following observation as to the purview of that tariff term:

* * * Those household utensils to which the provision in question refers are articles which possess an individual and independent usefulness as separate entities, whether or not permanently attached to the premises. On the other hand, articles which can not function independently, but become useful only when attached to other fixtures or devices, are not encompassed by the statutory provision for "household utensils." * * *

While the decision in this case was partly influenced by the legal distinction between "fixtures" and "utensils," the court, nevertheless, placed important stress on the fact that the imported articles, standing alone, were without purpose and use and functioned only as "parts," and there being no provision for parts of household utensils, they could not possibly be subject to classification under paragraph 339.

In *Samuel Shapiro & Co., Inc.* v. *United States*, 9 Cust. Ct. 246, C.D. 702, the court held that brass candlesticks, imported with holes drilled in the base of each and designed for the insertion of electrical equipment for use as electric lamp bases, were not dutiable under paragraph 339 as household utensils. The evidence established that an order for candlesticks, without further specifications, would not be fulfilled with the imported articles containing the drilled holes. The court concluded:

* * * Therefore, in spite of the fact that said articles are chiefly used in the home, in view of the fact that they are only parts of electric

lamps these bases must be excluded from said paragraph 339 for the reason that that paragraph contains no provision for parts of household utensils.

See also *Rothschild, Meyers & Co. (New York)* v. *United States*, 30 Treas. Dec. 405, Abstract 39374, wherein pot covers, designed for use with hollowware utensils, were held to be parts of such articles when imported separately and, therefore, not dutiable under paragraph 134, Tariff Act of 1913, as hollowware utensils in themselves.

The term "household utensils" has been held to be grammatically similar to the term "table and kitchen articles and utensils" in paragraph 218(f), both provisions encompassing articles chiefly or principally used in the household. *Koscherak Bros.* v. *United States*, 8 Cust. Ct. 300, C.D. 625. This same observation holds true for the modified version of paragraph 218(f) grouping together "household articles" with "table and kitchen articles and utensils." While the nature of the function of articles under the two terms differs, i.e., household utensils must serve a utilitarian purpose, while articles under paragraph 218(f), as modified, may be either utilitarian or decorative. *Frank P. Dow Co. and China Dry Goods Co.* v. *United States*, 46 Cust. Ct. 477, Abstract 65614, nevertheless, the manner in which the articles function in a household can be said to be similar, that is, either as the utensils or articles themselves or as parts of such articles or utensils. It is in this latter respect, the manner of functioning, that we view the above-cited cases as helpful in classifying the instant merchandise. The imported items of glass, although in the form of candy dishes, cake plates, etc., are designed specifically to be used with various metal bases and columns. They function in the household, not as imported, but as units, attached to and assembled with other substantial components. They possess no independent function and logically would not be substituted for household glassware without holes.

While each imported item is not designed for use with one particular article only, each one is dedicated for use as a part of that class of merchandise provided for in paragraph 218(f), as modified, namely, table and household articles and, as such, would be classifiable thereunder if said paragraph contained a "parts" provision. *Buegeleisen & Jacobson, Inc.* v. *United States*, 35 Cust. Ct. 237, Abstract 59276; *Charles A. Redden, Inc., and Ronson Art Metal Works et al.* v. *United States*, 39 Cust. Ct. 471, Abstract 61297.

The law is clear that where there is no provision for "parts" of articles, whether the tariff provision be *eo nomine* or use in character, imported merchandise held to be "parts" will not be susceptible of classification thereunder. *United States* v. *Draeger Shipping Co.*, 18 CCPA 308, T.D. 44561; *United States* v. *J. E. Bernard & Com-*

*pany, Inc.,* 42 CCPA 141, C.A.D. 586; *John L. Westland & Son, Inc.* v. *United States, supra.* This is so whether plaintiff's argument urging the inapplicability of the *Waltham* decision to classification under a use provision is deemed valid or not.

In holding, as we now do, that the merchandise was improperly assessed for duty under the carved-out provision in paragraph 218(f) for table and household articles, the question remains under which of the two claimed provisions does it belong? It seems quite apparent that the modified provision in paragraph 218(f) (in this instance as modified by T.D. 53865 and supplemented by T.D. 53877) calling for "all articles [except, for present purposes, table and household articles] of every description not specially provided for, composed wholly or in chief value of glass, * * * decorated * * * other, valued not over $1.66⅔ each"[2] is a more specific provision than paragraph 230 (d), as modified by T.D. 52739, encompassing "all glass, and manufactures of glass, or of which glass is the component of chief value, not specially provided for * * *." The term "all articles of every description" in paragraph 218(f) has been held to be a more specific designation than the tariff term "manufactures of." *International Expediters, Inc.* v. *United States,* 41 CCPA 156, C.A.D. 543. Therefore, if the imported items qualify for classification as all other glass articles, not specially provided for, within the modification of paragraph 218(f), then they must be so classified.

It is not disputed that the instant merchandise is of a decorated glass composition and, in this regard, satisfying the descriptive requirements in paragraph 218(f). On the other hand, paragraph 230(d) has been regarded as including pressed but undecorated glassware. See Comment, 1948, Summary of Tariff Information, volume 2, part 2, page 137.

Defendant argues, however, that if the merchandise consists of parts of paragraph 218(f) articles, it cannot also be considered as other articles within that paragraph. We do not agree. Certainly an article may be considered under one frame of reference to be but a part of a different article and yet, within another frame of reference, constitute a complete article in itself. In *D. N. & E. Walter & Co. et al.* v. *United States,* 44 CCPA 144, C.A.D. 652, the appellate court pointed out, in affirming the decision of the trial court, which had held that narrow strips of bamboo in 100-foot lengths were correctly assessed under the provision in paragraph 409 for "* * * all articles not specially provided for, wholly or partly manufactured of * * * bamboo," that the fact that such merchandise was ordinarily

---

[2] It is evident from the invoices and the *sub silentio* approach of the parties that each imported item is within this value bracket.

cut up to make smaller blinds or even other articles would not affect its status as an article. The term "articles" can have varying meanings depending upon the context, scope, or purpose of the tariff provision. The language of paragraph 218 (f) is clear and unambiguous and we have held that there is no reason to construe it other than as written. *Koscherak Bros.* v. *United States, supra.* The term "all articles of every description" appearing in the involved tariff provision, while construed to be narrower than a competing provision for "manufactures of," is, nevertheless, fairly broad, inclusive language. There is no dependency upon chief use as with the term "table and household articles." The glass items in this case, at the time of their importation, had reached their ultimate stage of readiness, that is, they had obtained the form, shape, design, and finish necessary to acquire commercial identity in retail market places. Although ordinarily sold in assemblies of glass and metal units, they obviously possess such structural finish so as to permit acquisition and use as additional or replacement parts of assemblies previously purchased. As such, they can be considered glass articles within the modified provision of paragraph 218 (f) for all glass articles of every description.

We realize, of course, that in departing from our holding in the previous *Adams* case, *supra*, we run, in a sense, contrary to the desired effect of uniformity in the customs treatment of imported merchandise. However, when the occasion arises, and especially here where we now have before us more persuasive exhibit evidence, it has been recognized that the better course is to reevaluate, rather than merely to perpetuate. *Adolphe Hurst & Co., Inc.* v. *United States*, 33 CCPA 96, C.A.D. 322.

For all of the foregoing reasons, we hold that the glassware involved in the entries covered by the protests herein are properly classifiable under paragraph 218 (f), Tariff Act of 1930, as modified by T.D. 53865 and supplemented by T.D. 53877, as other glass articles of every description, not specially provided for, and dutiable at the claimed rate of 30 per centum ad valorem. To the extent indicated the protests are sustained, and judgment will be rendered accordingly.

CONCURRING OPINION

NICHOLS, Judge: I concur in the result and in the opinion except for the part of the headnote; captioned "*Stare Decisis*" and the paragraph beginning: "We realize, of course, that in departing from our holding in the previous *Adams* case, *supra*, * * *." I would leave these portions out. The court says either too much about *stare decisis*, or not enough.

This is a perfectly ordinary situation in our jurisprudence. Counsel for the importer appeared in three 1961 protests involving the same issue. He tried one, in this court, and did not prevail. He moved for rehearing, without success. Then he brought forward the other two (which had been under suspension) instead of appealing. He tried them and made a new record. We are of the opinion that he should prevail on the new record. Being of that view, we would violate our oaths of office if we did not sustain the protests. I do not see why we should apologize for doing what we are bound to do.

Not in this case, to such a degree as in others, perhaps, the inadequacy of evidence at the first trial of a protest is frequently striking. We may see a case lost for absence of proof which, we are sure, must be easily obtainable, and later is obtained, e.g., as to component material of chief value, or chief use. In such instances, no question of *stare decisis* is involved if the decision of the second case differs from the first, obviously. Herein, the court's statement that the current decision is based on the new exhibits would seem made to remove occasion for any concern about *stare decisis*, and discussion of *stare decisis* becomes surplusage accordingly.

When the same counsel seems to be deliberately presenting a weak original case, to test out the court or opposing counsel, and when he then brings up all his artillery at the trial of the "new case," there is a temptation to hoist him by his own petard, treating the first holding as *stare decisis*. But it is in the first place impossible to be sure this abuse has been wilfully committed, and in the second place, even if we were sure, we would still be obliged to apply the facts and the law as we saw them to the "new case."

The protests now adjudicated being contemporary with that in the first case, there is nothing before us to show that our former decision was followed except in the very entry that was before the court, and it did not require to be acted on as it called for no reliquidation. Hence, our present action is "contrary to the desired effect of uniformity"—in the court's phrase—only as to that single entry, so far as we know, and as to that only because of the procedure plaintiff elected. As long as suspended cases were not abandoned, the former case could not reasonably have been made the basis of a practice. As the decision affirmed the collector, it made no change in the then practice of customs officers. Had it gone the other way, their practice would not have changed if the Government had decided to make a new case. Nonuniformity with respect to a single entry is manifestly a lot less serious than nonuniformity as to practice generally. Obstinacy in a wrong holding would sooner or later lead to nonuniformity as to practice.

In *Adolphe Hurst & Co., Inc.* v. *United States*, 33 CCPA 96, C.A.D.

322, which the headnote and text refer to, our court of last resort overruled its decision which had stood for almost 6 years and, according to the dissent therein, had guided the trade and "no doubt there has grown up a settled practice." The dissent urged that in the interests of "uniformity," when a case is the basis of a "settled and well-understood administrative practice" it should not be disturbed even though a "position, technically more correct, might be arrived at" upon new consideration. Though he did not say so expressly, the dissenting judge may have had in mind that lapse of time with trade and administrative acquiescence might make an incorrect decision correct. The situation here is so different that there is no reason to consider the dissent applicable, supposing we could or should give weight to what it urges.

As long as we entertain "new cases," as it would seem we must, we should receive any matter offered by the former losing party ungrudgingly and without adverse preconceptions. The necessity of apologizing for a decision in his favor might create a bias in our minds, and so we should not establish the precedent of making such apologies.

The matter most calling for apology, if anything does, in "new case" procedure, is the prolongation of uncertainty as to the correct tariff classification of merchandise. The instant controversy is, relatively, a baby. As this is being written, there are protests pending before this division for adjudication involving 1944 and 1945 entries, kept undecided by suspense and "new case" procedures. Such delays may cause damage to foreign producers, kept from exporting to United States markets by administrative assessment of illegally high duties. Or if the importation is not stopped, the illegal duties may be passed on to consumers in the form of higher prices. Then if, eventually, a lower rate prevails, the importer who has passed along the duty payments gets a windfall and the injury to others is uncorrected.

This appears to me an abuse, though I am not at all clear how it can be or should be controlled. This court cannot be and is not indifferent to long delays in litigation before it, from any cause. Many of them, however, are not in the power of the court to correct. The controversy now before us arose in 1959, and how near it is to final disposition is anybody's guess, yet the proceedings of counsel do not appear dilatory, nor was the evidence in the first trial carelessly presented.

I do not think it is desirable to intimate in any form of words that in a "new case" the court will more willingly affirm than overrule the former decision, and if the subject requires to be discussed at all, the above better indicates what I deem it proper to say.