RIEKES CRISA CORP., PLAINTIFF *v*. UNITED STATES, DEFENDANT

Consolidated Court No. 78–01–00192

(Dated April 2, 1990)

*Stein Shostak Shostak & O'Hara* (*Marjorie M. Shostak, Steven B. Zisser* Of Counsel), for plaintiff.

*Stuart M. Gerson,* Assistant Attorney General (*Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch), for defendant.

RE, *Chief Judge:* The question presented in this case pertains to the proper classification, for customs duty purposes, of certain glass articles imported from Mexico. The case is a consolidation of five separate civil actions brought to contest the tariff classifications of seven types of glassware, or glass articles, described by plaintiff as "glass lids," "glass domes," "Yard-of-Ales," "glass tray liners," "Liberty Bells," "demijohns," and "barrels."

All of the imported articles were classified under provisions of the Tariff Schedules of the United States (TSUS) as "[a]rticles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, household articles, and art and ornamental articles, all the foregoing not specially provided for: * * * [o]ther glassware."

The articles "[v]alued not over $0.30 each" were classified under item 546.52, TSUS, and were assessed duty at the rate of 50 per centum *ad valorem.* The articles "[v]alued over $0.30 but not over $1 each" were classified under item 546.54, TSUS, and were assessed duty at the rate of 30 per centum *ad valorem.* The articles "[v]alued over $1 but not over $3 each" were classified under item 546.56, and were assessed duty at the rate of 30 per centum *ad valorem.* The articles "[v]alued over $3 each" were classified under item 546.59, TSUS, and were assessed duty at the rate of 15 per centum *ad valorem.*

Plaintiff protests these classifications, and contends that the glass lids, glass domes, imported glass parts of the Yard-of-Ales, and glass tray liners are properly classifiable as "[a]rticles not specially provided for, of glass," under item 548.05, TSUS. Plaintiff contends that these articles, imported after January 1, 1976, are entitled to duty free entry as products of a beneficiary developing country under the Generalized System of Preferences, and that the articles imported prior to January 1, 1976, are subject to duty assessed at the rate of 12.5 per centum *ad valorem.*

Plaintiff further contends that the Liberty Bells, demijohns, and barrels are properly classifiable as "[c]ontainers * * * chiefly used for the packing, transporting, or marketing of merchandise * * *," under item 545.27, TSUS. Accordingly, plaintiff claims that the Liberty Bells and demijohns, which were imported prior to January 1, 1976, are subject to duty assessed at the rate of 0.2¢ per pound, and the barrels, which were imported after January 1, 1976, are entitled to duty free treatment under the Generalized System of Preferences.

Alternatively, plaintiff contends that the Liberty Bells, demijohns, and barrels are properly classifiable as "[l]amp bases" under item 545.55, TSUS. In its alternative claim, plaintiff contends that the Liberty Bells and demijohns are subject to duty assessed at the rate of 12 per centum *ad valorem,* and that the barrels are entitled to duty free treatment under the Generalized System of Preferences.

The pertinent statutory provisions of the Tariff Schedules are as follows:

*Classified Under:*

Schedule 5, Part 3, Subpart C:

Articles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, household articles, and art and ornamental articles, all the foregoing not specially provided for:

\*       \*       \*       \*       \*       \*       \*

Other glassware:

\*       \*       \*       \*       \*       \*       \*

    Other:

| | | |
|---|---|---|
| 546.52 | Valued not over $0.30 each .............. | 50% *ad val.* |
| 546.54 | Valued over $0.30 but not over $1 each .... | 30% *ad val.* |
| 546.56 | Valued over $1 but not over $3 each ...... | 30% *ad val.* |

    Valued over $3 each:

\*       \*       \*       \*       \*       \*       \*

| | | |
|---|---|---|
| 546.59 |     Other .......................... | 15% *ad val.* |

*Claimed Under:*

*Glass Lids, Glass Domes, Imported Glass Parts of Yard-of-Ales, and Glass Tray Liners, Claimed Under:*

Schedule 5, Part 3, Subpart D:

Articles not specially provided for, of glass:

\*       \*       \*       \*       \*       \*       \*

| | | |
|---|---|---|
| 548.05 | Other. .(imported before January 1, 1976) | 12.5% *ad val.* |
| | (imported after January 1, 1976) | free |

*Liberty Bells, Demijohns, and Barrels, Claimed Under:*

Schedule 5, Part 3, Subpart C:

Containers (except ampoules) chiefly used for the packing, transporting, or marketing of merchandise, and containers chiefly used for home canning and preserving, all the foregoing, of glass, with or without their closures and whether or not coated with plastics materials:

\* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 545.27 | Holding over 1 pint (imported before January 1, 1976) | 0.2¢ per lb. |
| | (imported after January 1, 1976) | free |

*Alternatively Claimed Under:*

*Liberty Bells, Demijohns, and Barrels, Alternatively Claimed Under:*

Schedule 5, Part 3, Subpart C:

Illuminating articles for use in the household or elsewhere in connection with artificial illumination (except candle illumination) in such manner as to pass, reflect, refract, disperse, color, or otherwise affect the light for practical or ornamental purposes; articles which reflect or color artificial light directed on them for use as, or in connection with, signs or signals; and parts of any of the foregoing articles; any of the foregoing, of glass, and not optically worked:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 545.55 | Lamp bases  .  (imported before January 1, 1976) | 12% *ad val.* |
| | (imported after January 1, 1976) | free |

The questions presented are:

(a) whether the imported articles have been properly classified by the Customs Service as "[a]rticles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, household articles, and art and ornamental articles, all the foregoing not specially provided for: * * * [o]ther glassware," under items 546.52, 546.54, 546.56, or 546.59, TSUS, with duty depending on the value of the article;

(b) whether, as contended by plaintiff, the imported glass lids, glass domes, imported glass parts of the Yard-of-Ales, and glass tray liners are properly classifiable as "[a]rticles not specially provided for, of glass," under item 548.05, TSUS; and

(c) whether the imported Liberty Bells, demijohns, and barrels are properly classifiable as "[c]ontainers * * * chiefly used for the packing, transporting, or marketing of merchandise * * *," under item 545.27, TSUS, as contended by plaintiff.

As to the Liberty Bells, demijohns, and barrels, plaintiff alternatively claims that they are classifiable as "[l]amp bases," under item 545.55, TSUS.

In order to decide the questions presented, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co.* v. *United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed. Cir. 1984). Pursuant to 28 U.S.C. § 2639(a)(1) (1982), the government's classifications are presumed to be correct, and the burden of proof is upon the party challenging the classifications. *See Jarvis Clark Co.,* 733 F.2d at 876.

After an examination of the merchandise, the pertinent tariff provisions and case law, and the testimony of record, it is the holding of the court that the glass lids, glass domes, Liberty Bells, demijohns, and barrels have been properly classified by Customs. The court also holds that, as to the imported glass parts of the Yard-of-Ales, and the glass tray liners, plaintiff has rebutted the presumption of correctness that attaches to the classification by Customs, and that the glass parts of the Yard-of-Ales and the glass tray liners are properly classifiable as "[a]rticles not specially provided for, of glass," under item 548.05, TSUS.

### THE IMPORTED GLASSWARE

The *glass lids,* which were imported in 1976 and 1977, are described in plaintiff's catalogues as "domes" or "cheese domes," items 0957, 1083, and 3791. The lids are glass structures, having a round bottom, and are pictured in plaintiff's catalogues covering items of food. The glass lids have a knob or handle on top. Each model number represents a different sized glass lid.

The *glass domes,* which were imported in 1974 and 1977, are described in plaintiff's catalogues as "domes," items 3727, 3737, and 3738. The domes differ from the lids in that they are taller, and have round bottoms of a smaller diameter. In addition, the domes have no knob or handle, and are pictured in plaintiff's catalogues over displays of stuffed animals or artificial flowers.

The *Yard-of-Ales,* which were imported in 1977 and 1979, consist of slender drinking glasses, almost three feet in height, which, after importation, are placed on a wooden stand and sold as novelty items. Only the glass portions of the Yard-of-Ales are imported, and only the glass portions are at issue in this case.

The *glass tray liners,* which were imported in 1974, are plain glass receptacles, containing four panels or dividers. The glass tray liners are intended to be placed in silver trays, to protect the trays from damage from food.

The *Liberty Bells,* which were imported in 1973, 1974, and 1975, and the *demijohns,* which were imported in 1975, are glass bottles. The Liberty Bells are 19½″ tall, have a volume of 5 gallons, and are shaped

roughly like the Liberty Bell. The demijohns are 12″ tall, have a volume of 2½ gallons, and are pear-shaped.

The *barrels,* which were imported in 1979, are glass structures, shaped like a barrel and having a glass lid or top which does not screw on. The imported merchandise in this case includes barrels with volumes of 5 liters, 10 liters, and 15 liters.

## THE TRIAL TESTIMONY

At trial, plaintiff presented the testimony of Mr. Max Riekes, its president from 1973 to 1980, and Mr. Don W. Dickey, Jr., a manufacturer's representative for plaintiff's successor, the Crisa Corporation. Plaintiff also submitted several of its catalogues and promotional brochures, as well as samples of all of the imported articles except the glass tray liners and the Liberty Bells.

Mr. Riekes identified samples of the imported *glass lids* and *glass domes.* He stated that the glass lids and glass domes were not sold to retail dealers in their condition at importation. Mr. Riekes testified that "[t]hey were sold to people that * * * made bases, either wood bases or glass bases or marble bases * * *." Mr. Riekes viewed several depictions of the glass lids, in plaintiff's 1980 catalogue, over accompanying glass plates or bases, and stated that the lids were sold "with a glass base."

Mr. Riekes was questioned about the depiction of the glass domes, in plaintiff's general catalogue for 1974, over small animal figurines or floral displays. He explained that the catalogues "show[ ] items that were placed in the domes and used to display items put there by taxidermists, floral pieces or animals, and it's the way they were used and the way that we sold them and that is what people did with them." He stated that "[t]here is a base to these [glass domes] with whatever they put them in as a display item." Mr. Riekes added that "[a]t one time we did sell [the domes] with wood bases which is the only way you can sell them to a retail outfit."

Mr. Riekes also identified a sample of the *Yard-of-Ales.* He testified that only the glass parts of the Yard-of-Ales were imported. He stated that the imported glass parts of the Yard-of-Ales could not be used without the wooden stand, because "you have to put [the glass part] back [on the wooden stand] in order to keep it, because [the glass part] couldn't stand the way it is made." Mr. Riekes testified that he had seen a Yard-of-Ale being used, and noted that he had

> always seen it used by holding the wood handle and holding the glass and using both hands to drink because it was a very large item and you really have to handle it away from you in drinking it, and you also have to keep twisting it in order so you don't get it all on you at once.

He added that the Yard-of-Ales were sold to institutional dealers, who "sold [them] to bars and restaurants and people that served beer or ale."

From a diagram and picture, Mr. Riekes identified the *glass tray liners* at issue. He testified that the glass tray liners were manufactured pursuant to a request from the Leonard Silver Company, for use in its

silver trays, and stated that plaintiff sold the glass tray liners only to Leonard Silver. Mr. Riekes added that "every silver company buys glass to fit in [silver] tray[s] because when you put condiments on it, acid has an effect on silver plate."

Mr. Riekes also identified samples of the *demijohns* and *barrels* at issue in this case, and identified the *Liberty Bells* from pictures in plaintiff's catalogues. All three items, in plaintiff's general catalogue for 1974, were pictured as terrariums. Mr. Riekes also observed depictions of the Liberty Bells and barrels, on advertising brochures of lamp manufacturers, as bases for lamps. Mr. Riekes stated that the Liberty Bells "were sold for lamps and they were sold for terrarium type items." He added that, as for the barrels, "the majority were sold for lamps and terrariums at that time."

On cross-examination, Mr. Riekes was questioned about the depiction of glass domes in plaintiff's 1977 catalogue. In the catalogue, the domes were pictured displaying floral displays or figurines, and resting on a flat table top, without a base. He agreed that several of the domes pictured without bases were the same size and type as some of the glass domes in this case. Mr. Riekes was also asked whether plaintiff's salespersons sold domes, without their accompanying bases, to retail stores. He replied that "they are not supposed to, they didn't because * * * the [ ] [domes] need a base, they need something because [the bottom] is the thinnest part of the glass." He added that the glass domes must be placed on a base which "has a groove or on a glass plate * * *."

On redirect examination, Mr. Riekes explained that the glass domes at issue were not sold to retailers, but were "sold to people that made the bases or people that[,] like taxidermists, * * * put * * * products in there * * * and then put bases on them and they would sell the product that way."

Mr. Dickey, who had worked in the glassware industry since 1972, stated that he had worked for plaintiff from 1979 to 1983, and for its successor corporation from 1986 to 1989. During the time of importation, he worked for Libbey Glass, a manufacturer of various glass household articles. Mr. Dickey added that during this period he attended "the majority of the food service shows, premium shows, the houseware shows, which were the major shows that were attended."

Mr. Dickey testified that plaintiff was a "retail and institutional distributor[ ] for Libbey Glassware," and that he "worked with [plaintiff's] sales people and with their accountants to sell the merchandise * * *." During his time at Libbey, he became familiar with the imported articles in this case, and he produced "a monthly report that involved our major account activities, major trends, that we would see in the market place, major needs of new product[s]." Mr. Dickey stated that plaintiff and Libbey competed "with a vengeance."

After joining plaintiff in 1979 as its southern regional sales manager, Mr. Dickey conducted "a very thorough and complete study" of plaintiff's products and "the distribution that had been made by [plaintiff]

during the years prior to [his] employment by them[.]" He stated that his study "was for the southeast, southwest region and each counterpart [regional sales manager] was responsible for doing their own study of the same items."

Mr. Dickey testified that, according to his study, roughly half of all sales of *glass lids* and *domes* were to fabricators, who made accompanying bases, and added that the remainder of sales of the glass lids and domes were to the food service industry. He specifically commented on glass lid item 3791, at issue here, which had a 8³/₈″ diameter. He commented that item 3791 "fit perfectly on a 10 inch dinner plate and in the more expensive hotels, the better clubs and restaurants, they were used * * * [to] cover the food for room service or small amenities they would bring into the room * * *." Item 3791 was used "[a]s a component part of a unit" for food service.

Mr. Dickey noted that, after he joined plaintiff in 1979, the majority of the glass domes "were sold to the wholesale florist[s] * * *. The second largest users were the taxidermists who would put things in them from butterflies to game birds, even little squirrels * * *." He noted that the glass domes were "almost always used * * * with the base to hold the figure that they would put underneath it in place."

Mr. Dickey also noted that retail sales of both the glass lids and domes "were virtually nonexistent entities." He explained that "[t]he majority of the inquiries we would get would simply be to replace one they had bought."

As for the *Yard-of-Ales,* Mr. Dickey testified that his study revealed that "[a]llmost 90 percent of [sales] were to the food service industry or distributors." The distributors sold "directly to the restaurants and eating institutions such as hospitals, bank dining rooms, country clubs, fast food restaurants * * *." He noted that, after he joined plaintiff in 1979, "almost 90 percent or more [of the sales of Yard-of-Ales were] directly to the food service industries or end user, the large restaurateurs." He stated that, in 1979, the glass parts of the Yard-of-Ales were not sold separately except "as a replacement, mainly through the food service distributor."

As for the *Liberty Bells,* Mr. Dickey testified that according to his study "[a]llmost 90 percent of the total sales in the territory were to either the lamp manufacturers or to the wholesale florist." His study revealed that sales of the *demijohn* "[were] basically concentrated on the wholesale florist end of the business * * * and * * * I don't recall exactly what [percentage was sold] to the lamp manufacturers." Mr. Dickey's study also showed that sales of the *barrels* "were basically * * * to the florist, the lamp manufacturers and we did a good deal of business with the [food service distributors]." He stated that the barrels were used in southern Texas to store and display such foods as jalapenos, pickles, pigs' feet, and deviled eggs.

On cross-examination, Mr. Dickey was questioned about his 1979 study on the sale of plaintiff's glassware. Mr. Dickey stated that "[t]he

majority of [my testimony] and what I can recall specifically is in my specific southern region." He added that "I do not know the numbers and I not have a copy of all the regions but they were very, very close[,] but the percentages I don't remember."

In response to questioning on the particular articles in this case, Mr. Dickey agreed that glass domes and lids "are a recognized product" in the glassware industry, and that the barrels were commonly used by small merchants to store and display foods.

In support of the customs classification, the defendant called Mr. John Meier, vice president of marketing and sales for Libbey Glass, who testified that, until 1987, Libbey had been a division of Owens-Illinois, a large company whose principal business is the manufacture of glass containers. Mr. Meier stated that the "principal distinction" between Libbey and the container division of Owens-Illinois is that Libbey makes "[g]lassware, household articles for the kitchen, for the entertainment room, for the patio, consumer products, drinking glasses * * *." In contrast, the container division of Owens-Illinois makes, "[f]or example, the Budweiser beer bottles and the Heinz bottles, Gerber baby food jars * * *."

Mr. Meier testified that among Libbey's competitors were firms such as plaintiff, that import products, and that, through his service with Libbey Glass, he was familiar with the imported articles in this case. He added that Libbey had "manufactured and sold articles like or similar to those involved in this case[.]"

Mr. Meier defined "glassware" as "any and all household objects made of a glass composition * * *." He viewed the samples of the imported articles, and the various pamphlets and brochures presented by plaintiff, and concluded that all of them are "glassware." He added, however, that the wooden stands for the *Yard-of-Ales* and the silver trays, in which the *glass tray liners* were placed, were not "glassware."

Mr. Meier testified that Libbey had manufactured "cheese domes," which were similar to plaintiff's *glass lids,* and stated that

> the only way we marketed the cheese dome[s] w[ere] by themselves. That is how they were shipped in our cartons and we shipped them to * * * all the mass merchants in America as well as, admittedly, to people who would put something under it * * *.

Mr. Meier testified that Libbey did not manufacture articles that competed with plaintiff's *glass domes* or *Yard-of-Ales,* although he was familiar with these glassware articles because they were "in the market place." Mr. Meier described the Yard-of-Ales as "novelty drinking glass[es.]." Mr. Meier noted that Libbey believed that the glass domes could be used without a base, like the glass lids or cheese domes, and added that plaintiff's glass domes are "glassware article[s] in and of [themselves]," and have uses "both with and without a base."

Mr. Meier observed a depiction of one of plaintiff's *glass tray liners,* and described it as "a glass tray." Since Libbey had sold glass trays, he

was familiar with these articles, and stated that one of plaintiff's glass tray liners "could serve snacks, hors d'oeuvres, catchall on the top of a night stand for jewelry, rings, it could be used as a catchall on top of a man's dresser, change, matches, keys, a variety of objects as it is."

As for the *Liberty Bells* and *demijohns,* Mr. Meier testified that Libbey "had a line of what we called Liberty Bell canisters[,]" which were "bell shaped glass objects." He also stated that Libbey "did not manufacture an article like the demijohn but we did manufacture an article that we believe competed against it * * *," and that Libbey "sold it as a terrarium to the wholesale florist industry as well as the retail discounters."

Mr. Meier noted that Libbey had manufactured a "barrel canister" similar to plaintiff's *barrels* at issue in this case. Mr. Meier stated that the principal difference between the two products was that Libbey's barrel canister "had a metal lid which screwed on." He explained that this was

> [b]ecause the particular customer was a pickle packer and had brine when he shipped the product so he needed a closure system that would be compatible with the Federal Food and Drug Administration regulations, etc. and he sold his product and consumers would buy it and, do with it in their households as they saw fit.

In contrast to Libbey's barrel canister, plaintiff's barrels had glass lids which did not screw into the top of the barrels. Mr. Meier stated that he did "not believe this system as it is * * * would be good for this pickle packer in transit."

On cross examination, Mr. Meier testified that Libbey's cheese domes, which were similar to plaintiff's glass lids, were sold to both retailers and fabricators, and that the cheese domes were sold to retailers "like K-Mart in bulk, * * * in a corrugated box by itself." Libbey's cheese domes were often used with a "big chopping block," "[w]here a block of cheese is on this big chopping block as is a spread of crackers, as is an arrangement of fruit, and over the cheese there is a dome." He admitted, however, that the fabricators "normally put [the cheese domes] together with something." Mr. Meier also admitted that, in Libbey's 1973 catalogue, the cheese domes were pictured and marketed with accompanying bases.

Mr. Meier stated that Libbey had made glass trays similar to the glass tray liners at issue, but noted that Libbey's trays "[w]ere * * * intended to be used by themselves[.]" On cross examination, he noted that in its 1973 catalogue, Libbey displayed glass articles similar to the barrels at issue and that they were described as "terrariums." He also stated that Libbey had manufactured a glass article similar to plaintiff's Liberty Bells, and that Libbey "attempted to sell them to the floral industry [and] to the retail industry."

## DISCUSSION

In this consolidated case, Customs classified the seven types of imported glass articles as "[a]rticles chiefly used in the household * * *," a provision governed by "chief use," under items 546.52, 546.54, 546.56,

and 546.59, TSUS, depending upon the value of the particular article. Pursuant to General Interpretative Rule 10(e)(i),

> a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined. * * *

It is well established that "classification should not be determined on the basis of the use to which the individual articles included in the instant shipments are to be put, but on the basis of chief use of articles of that class generally." *United States* v. *Colibri Lighters (U.S.A.) Inc.,* 47 CCPA 106, 109, C.A.D. 739 (1960). In classifying imported articles by chief use, it is also basic that "[i]n determining such use it is proper to consider not only the testimony offered, but the characteristics of the merchandise itself." *Id. See also Border Brokerage Co.* v. *United States,* 65 Cust. Ct. 277, 284, C.D. 4089, 343 F. Supp. 1396, 1401 (1970).

## I. *Glass Lids, Glass Domes, Glass Parts of Yard-of-Ales, and Glass Tray Liners:*

Plaintiff contends that "[t]he imported glass liner trays, domes, lids, and the imported glass portion of the 'Yard of Ale' are parts of glass household articles, and were therefore erroneously classified under the provisions for glass household articles or glass articles for preparing, serving or storing food or beverages, which do not contain provisions for parts." The defendant, in support of the customs classifications, contends that these articles "are all glassware articles which are commercially useful by themselves and are chiefly used for preparing, serving or storing food or beverages or as household articles."

It is well to state at the outset that, under well established principles of customs law, "a tariff provision which does not specifically provide for parts does not include them." *Glass Prods., Inc.* v. *United States,* 10 CIT 253, 255, 641 F. Supp. 813, 814 (1986) (hereinafter *Glass Products*). *See also United States* v. *Bruckmann,* 65 CCPA 90, 94, C.A.D. 1211, 582 F.2d 622, 625 (1978); *Westminster Corp.* v. *United States,* 78 Cust. Ct. 22, 26, C.D. 4687, 432 F. Supp. 1055, 1058, *appeal dismissed,* 64 CCPA 179 (1977).

In support of its contentions, plaintiff cites the opinion of this court in *Glass Products.* In *Glass Products,* the imported merchandise consisted of "closed-bottom candle receptacles of glass[,] * * * imported in a variety of shapes, sizes, and colors, and * * * commercially known as votive cups or votive lights." 10 CIT at 254, 641 F. Supp. at 814. The merchandise was classified by Customs "as household articles of glass, under item 546.60 of the [TSUS]." *Id.* at 253, 641 F. Supp. at 813. Plaintiff protested this classification, and contended "that the merchandise is properly classifiable under item A548.05, TSUS, as articles of glass not

specifically provided for, free of duty under the Generalized System of Preferences." *Id.* The court sustained plaintiff's protest. *See id.* at 258.

In *Glass Products,* it was "stipulated that the imported merchandise is chiefly used in households as parts of decorative articles of metal, plastic, or wood." *Id.* at 254–55, 641 F. Supp. at 814. It was also "stipulated that the votives are neither freestanding nor self-supporting, and are incapable of any practical use in their condition as imported." *Id.* at 255, 641 F. Supp. at 814.

This court, in *Glass Products,* discussed two Customs Court decisions which supported the contentions of the plaintiff in that case. Specifically, the court discussed *William Adams, Inc.* v. *United States,* 56 Cust. Ct. 429, C.D. 2670 (1966), and *Hudson Merchandise Co.* v. *United States,* 58 Cust. Ct. 341, C.D. 2980 (1967).

In *William Adams,* the imported merchandise consisted of glass plates with "a small hole 'drilled through the bottom at the center [which served] as a means for fitting metal bases or other attachments.'" *Glass Products,* 10 CIT at 256, 641 F. Supp. at 815 (quoting *William Adams,* 56 Cust. Ct. at 432). The Customs Service classified the imported merchandise in *William Adams* as "household or table articles under paragraph 218(f) of the Tariff Act of 1930." *Id.* The plaintiff in that case protested the classification, and contended "that the merchandise was classifiable either as manufactures of glass, not specially provided for, or as articles in chief value of glass, other than household table, or kitchen articles." *Id.*

As stated in the *Glass Products* case, the *William Adams* court determined that

> "[t]he imported items of glass, although in the form of candy dishes, cake plates, etc., *are designed specifically to be used with various metal bases and columns.* They function in the household, not as imported, but as units, attached to and assembled with other substantial components. *They possess no independent function* and logically would not be substituted for household glassware without holes."

*Glass Products,* 10 CIT at 256, 641 F. Supp. at 815 (emphasis added) (quoting *William Adams,* 56 Cust. Ct. at 437). Hence, in *William Adams,* the Customs Court "sustained the protests, and held that the imported merchandise was properly classifiable as 'other glass articles.'" *Id.*

In *Hudson Merchandise,* the other Customs Court case discussed by this court in *Glass Products,* "the imported merchandise consisted of parts of small, hourglass-shaped sand timers." *Glass Products,* 10 CIT at 256, 641 F. Supp. at 815. The Customs Service classified the sand timers as "glass household articles." *Id.* The plaintiff in *Hudson Merchandise* protested the classification, and contended "that the merchandise was properly classifiable as 'manufactures of glass, not specially provided for.'" *Id.*

In the words of *Glass Products,* in *Hudson Merchandise* the court determined that the sand timers were "not 'usable in the home without the addition of plastic stands, housing or similar units.' " *Glass Products,* 10 CIT at 256, 641 F. Supp. at 815 (quoting *Hudson Merchandise,* 58 Cust. Ct. at 344). In *Hudson Merchandise* it was also found that "[t]he imported glass articles represented 'but a portion of the thing described in the collector's classification.' " *Id.* at 256, 641 F. Supp. at 815–16 (quoting *Hudson Merchandise,* 58 Cust. Ct. at 344). Hence, in *Hudson Merchandise,* the Customs Court held that the sand timers had been improperly classified by Customs, and "ordered the merchandise reclassified pursuant to the residuary provision of paragraph 218(f) as 'other glass articles.' " *Id.* at 257, 641 F. Supp. at 816.

In view of its analysis of the *William Adams* and *Hudson Merchandise* cases, the court in *Glass Products* concluded "that the votive cup is merely *a part* of decorative articles used in the home." *Id.* at 257, 641 F. Supp. at 816 (emphasis in original). The court stated that "[t]he applicable precedents make clear that a glass article which can be used only as a part of another article used in the home cannot be classified as a household article." *Id.* Hence, the court held that the votive cups had been improperly classified by Customs, and sustained plaintiff's protest that they should have been classified "as glass articles not specially provided for, under item 548.05, TSUS." *Id.* at 258, 641 F. Supp. at 817.

In this case, plaintiff submits that the evidence "establishes that the imported liner trays, domes, lids and yard of ale glass, are parts only, of other articles, and, like the votive cups in *Glass Products,* * * * cannot properly be classified under the provisions for articles chiefly used in the household for preparing, serving or storing food or beverages, or as household articles of glass, which do not contain provisions for 'parts.' "

A. *Glass Lids and Glass Domes:*

The imported articles in *Glass Products,* and in the two cases discussed in that opinion, contain significant factual differences from the glass lids and glass domes in this case. In those cases, it was clear that the imported glass articles, in their condition as imported, were not "articles chiefly used in the household," and were merely *a part* of another article. In *Glass Products,* it was stipulated by the parties "that the votives are neither freestanding nor self-supporting, and *are incapable of any practical use in their condition as imported."* 10 CIT at 255, 641 F. Supp. at 814 (emphasis added). In *Hudson Merchandise,* the court found that "[t]he imported blown tubular glass articles, or sand timers as they are referred to on the invoice, *are unused and,* practicably speaking, *unusable in the home without the addition of plastic stands, housings, or similar units."* 58 Cust. Ct. at 344 (emphasis added).

The *William Adams* case is also distinguishable, even though the court recognized that the imported glass plates, each containing a hole 1/8″ in diameter, "can be considered capable of some household use. * * *" 56 Cust. Ct. at 435. The *William Adams* court, however, found

that if the imported plates were intended to be used alone, "other articles of relatively less cost and without * * * holes would be purchased instead." 56 Cust. Ct. at 436. Furthermore, the court stated that there was "uncontradicted evidence" "that the metal and glass sections are sold in combinations with each other. * * *" *Id.* at 435. Hence, on those facts the court concluded that the imported glass plates were not chiefly used in the household, in their condition as imported. *See id.* at 435–36.

In contrast, in this case, the testimony and exhibits reveal that the lids and domes, in their condition as imported are usable and marketable, and are "articles chiefly used in the household."

Plaintiff contends that the glass lids were improperly classified as glass articles chiefly used for preparing or serving food or beverages because they "are not used commercially in their imported condition but are combined with a base before distribution and sale to or use by the ultimate consumer." In support of the classification, the defendant contends that the glass lids are "articles identifiable and useful by themselves. * * *"

Mr. Meier, the defendant's witness, testified that Libbey manufactured articles similar to plaintiff's glass lids, and that "the only way we marketed [them] was by themselves." He also stated that these articles could be used by themselves, without an accompanying base, and identified the lids as recognizable articles of glassware.

Even apart from Mr. Meier's testimony, an examination of the glass lids indicates that they may be placed directly on a counter or shelf, and used to display items of food. Indeed, in plaintiff's catalogues, the glass lids are not identified as "lids," but rather as "domes" or "cheese domes," and, in plaintiff's 1977 catalogue, there are two pictures of the glass lids *being used without a base,* to display cheese on large cutting boards. These pictures confirm Mr. Meier's testimony that Libbey occasionally pictured its cheese domes, in its catalogues, on large cutting boards.

The testimony of Mr. Meier regarding Libbey's sales practice on its cheese domes, together with an examination of the glass lids and their depiction in plaintiff's catalogues, indicate that plaintiff has failed to bear its burden in establishing that the imported glass lids are "incapable of use in [their] condition as imported." *Glass Products,* 10 CIT at 257, 641 F. Supp. at 816. Indeed, the evidence is to the contrary and shows that the glass lids themselves are "articles chiefly used in the household," and are not solely parts of household articles. Hence, based upon its evaluation of all of the evidence the court concludes that the imported glass lids have been properly classified by Customs.

As to the glass domes, plaintiff contends that "[t]he evidence clearly established that the domes did not function in the household separately, as imported, but rather as units assembled with other substantial components, i.e., wood, glass, or marble bases." For support, plaintiff cites the same evidence submitted as to the glass lids. In essence, plaintiff relies on the testimony of Mr. Riekes and Mr. Dickey that plaintiff sold the

glass domes to fabricators who manufactured bases for the domes, and sold the articles as a set.

Mr. Meier, however, was very specific that plaintiff's glass domes "could be and were capable of being used by themselves, just placing them over some object of art[.]" He was firm in his testimony that the glass domes are "glassware article[s] in and of [themselves]," and have uses "both with and without a base." Furthermore, beyond the testimony of any witness, an examination of the imported glass domes reveals that they may be used to display objects on shelves or tables, without an accompanying base. It is clear that the glass domes themselves are "articles chiefly used in the household," and not solely parts of household articles.

Hence, since plaintiff has failed to establish that the imported glass domes are "incapable of use in [their] condition as imported," *Glass Products,* 10 CIT at 257, 641 F. Supp. at 816, they have been properly classified by Customs.

### B. *Glass Parts of Yard-of-Ales:*

Plaintiff contends "that the imported glass for the Yard of Ale constitutes a part only of another article, rather than a glass article chiefly used for preparing, serving or storing food or beverages." Plaintiff submits that "[t]he evidence established that the imported articles are not substantially complete in their condition as imported, since the omission of the wooden stand is very significant to the overall functioning of the complete article."

In support, plaintiff cites the testimony of Mr. Riekes, who stated that the imported glass parts of the Yard-of-Ales could not stand, unless placed on the accompanying wooden stand. Mr. Riekes had "always seen [the Yard-of-Ales] used by holding the wood handle and holding the glass and using both hands to drink * * *," and except for replacement sales, the imported parts of the Yard-of-Ales were not sold separately from the wooden stand.

Although Mr. Meier described the imported glass parts of the Yard-of-Ales as "novelty drinking glass[es]," he did not testify that he had ever seen any Yard-of-Ales used or displayed without its wooden stand.

An examination of the imported glass parts of the Yard-of-Ales indicates that they can not be used, and that, except as a replacement, they are unlikely to be purchased, without the wooden stand. Hence, the court agrees with plaintiff's contention that the glass parts of the Yard-of-Ales are only "parts" of an "article chiefly used in the household," and, therefore, have been improperly classified. Since plaintiff has carried its burden of proof, the imported glass parts of the Yard-of-Ales are properly classifiable as "[a]rticles not specially provided for, of glass," under item 548.05, TSUS.

### C. *Glass Tray Liners:*

Plaintiff contends "that the imported glass liner trays are parts only of other articles, imported solely for use with silver trays by Leonard Sil-

ver Company." Plaintiff relies on the testimony of Mr. Riekes that "established that the glass liner tray was a specially designed proprietary item imported and sold to only one company and used exclusively as a component part of that Company's silver trays."

In his undisputed testimony, Mr. Riekes stated that the glass liner trays were ordered by the Leonard Silver Company, and were sold only to Leonard Silver. On cross examination, Mr. Riekes pointed out that the glass liner trays did not have any knurls or "feet," and that the knurls were on the accompanying silver trays.

The defendant's only evidence, as to the glass liner trays, was the testimony of Mr. Meier, who stated that, in his opinion, Libbey's glass tray liners could be used independently as trays. The defendant, however, did not establish that Libbey's glass trays were of the same "class or kind" as the glass tray liners at issue.

In sum, the evidence is undisputed that the glass liner trays were manufactured for and sold exclusively to a single silver manufacturer for use in its silver trays. Since plaintiff succeeded in establishing that the glass liner trays are only "parts" of "articles chiefly used in the household," they were erroneously classified, and are properly classifiable as "[a]rticles not specially provided for, of glass," under item 548.05, TSUS.

## II. *Liberty Bells, Demijohns, and Barrels:*

Plaintiff contends that "[t]he imported Liberty Bell and demijohn water bottles and the glass barrels are properly classifiable as containers for the marketing of merchandise." It submits that "[t]he evidence in this case clearly established that the Liberty Bell and Demijohn water bottles and the large size barrels at issue do not belong to a 'class or kind' of merchandise chiefly used in the household for preparing, serving or storing food or beverages." Instead, plaintiff contends that the three glass articles are "more specifically provided for as usual and ordinary containers." Alternatively, plaintiff contends that "the Liberty Bell and demijohn water bottles and the glass barrels should be classified under the provision in item 545.55, TSUS, for lamp bases."

The defendant contends that "[s]ince the Liberty Bells, demijohn and barrel shaped glass vessels are not 'containers chiefly used for packing, transporting or marketing of merchandise within the scope of item 545.27, TSUS and are not chiefly used as illuminating articles, they were correctly classified by the Customs Service."

As to the Liberty Bells, demijohns, and barrels, the question presented is whether they are more properly described as "articles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages," as contended by the defendant, or as "containers * * * chiefly used for the packing, transporting, or marketing of merchandise," as maintained by plaintiff.

The "chief use" of imported merchandise, within the meaning of General Interpretative Rule 10(e)(i) of the TSUS, is the chief use "at, or immediately prior to, the date of importation, of articles of that class or

kind to which the imported articles belong * * *." In determining the "class or kind" of imported articles, the court must consider

> the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, the recognition in the trade of this use.

*United States* v. *Carborundum Co.,* 63 CCPA 98, 102, C.A.D. 1172, 536 F.2d 373, 377 (citations omitted), *cert. denied,* 429 U.S. 979 (1976). In *Carborundum,* the court specifically noted that "[s]usceptibility, capability, adequacy, or adaptability of the import to the common use of the class is not controlling." *Id.*

In *Riekes Crisa Corp.* v. *United States,* 84 Cust. Ct. 132, C.D. 4852 (1980), the imported merchandise consisted of glass jars designed for use as candle holders. The jars were classified by the Customs Service "as other glassware household articles, not specially provided for [,]" under items 546.51 or 546.52, TSUS. *Id.* at 133. Plaintiff protested the classification, and contended that the imported jars were properly classifiable "as other containers of glass chiefly used for the packing, transporting, or marketing of merchandise, holding over 1 pint, under the provisions of item 545.27, TSUS." *Id.* at 134.

In considering plaintiff's claimed classification in *Riekes Crisa,* the Customs Court reviewed several of its previous decisions, and noted that "the class or kind of containers intended by Congress to be embraced by the provisions of item 545.27 are the usual, ordinary, and commonly used glass containers for various commodities or merchandise." *Id.* at 155.

Similarly, in *Poland Bros., Inc.* v. *United States,* 64 Cust. Ct. 248, C.D. 3986 (1970), the imported merchandise, garment bags, were classified by the Customs Service "as 'household articles not specially provided for' under item 772.15 of the [TSUS]. * * *" *Id.* at 249. Plaintiff protested the classification, and contended that the garment bags were properly classifiable as " '[c]ontainers of rubber or plastics, * * * chiefly used for the packing, transporting, or marketing of merchandise,' " under item 772.20, TSUS. *Id.* The Customs Court noted that "[t]he record reveals a variety of uses for the garment bags[,]" and that they were "designed and constructed in such a manner as to be capable of being used even after the delivery or transportation of the suit to the purchaser's home." *Id.* at 254. Hence, the court denied plaintiff's protest, and held that the imported garment bags had been correctly classified by Customs as household articles not specially provided for. *See id.* at 255.

In this case, from a review of the testimony, the samples, and the other exhibits introduced at trial, it is clear that the Liberty Bells, demijohns, and barrels are not "containers chiefly used for the packing, transport-

ing, or marketing of merchandise," as that language is used in item 545.27, TSUS.

An examination of the imported Liberty Bells and demijohns reveal that they may be used as containers for the storage of water, and indeed, in plaintiff's catalogues, they are described by volume. They both contain small openings, similar to the top of a bottle, and in plaintiff's 1977 catalogue, the Liberty Bells and demijohns are listed under a heading for "bottles." Similarly, in plaintiff's 1980 catalogue, they are identified as "water bottles."

Furthermore, in plaintiff's 1973 and 1974 catalogues, the Liberty Bells and demijohns were prominently displayed as terrariums, containing plants. In its 1980 catalogue, a demijohn is pictured being used as a terrarium, and a Liberty Bell is pictured in use as a fishbowl.

Mr. Riekes testified that the Liberty Bells were sold for use as terrariums or as lamp bases, and Mr. Dickey that the Liberty Bells and demijohns were sold to wholesale florists and lamp manufacturers. A physical examination reveals that the Liberty Bells and demijohns can be reused after being used as a terrarium, or containing water or other liquids. An examination will also reveal that the Liberty Bells and demijohns are decorative articles.

It may also be noted that Mr. Riekes testified that plaintiff is one of four divisions of Riekes & Sons, Inc. The divisions are Riekes Crisa, Riekes Equipment, Riekes Leasing, and Riekes Container. Riekes Crisa, the plaintiff, was established to sell glassware, "primarily" different products than those sold by Riekes Container.

Since the Liberty Bells and demijohns are not "usual, ordinary, and commonly used glass containers * * *," *Riekes Crisa,* 84 Cust. Ct. at 155, plaintiff has not shown that they are chiefly used as "containers for the packing, transporting, or marketing of merchandise."

Mr. Riekes testified that the barrels were sold for use either as lamps or terrariums. Mr. Dickey testified that the barrels are commonly used by merchants in southern Texas to display for sale jalapenos, pickles, pigs' feet, and deviled eggs. Mr. Dickey added that the barrels, in addition to being sold to florists and lamp manufacturers, were sold to food service distributors. In plaintiff's 1973 and 1974 catalogues, the barrels are pictured being used as terrariums.

Like the Liberty Bells and demijohns, however, the barrels are decorative articles that are not "the usual, ordinary, and commonly used glass containers. * * *" *Riekes Crisa,* 84 Cust. Ct. at 155. The barrels may be reused after serving as containers for the display of foods, or as lamp bases or terrariums, and like the Liberty Bells and demijohns, were not sold by plaintiff's container division. From all of the evidence the court concludes that plaintiff did not bear its burden of establishing that the barrels are chiefly used as "containers for the packing, transporting, or marketing of merchandise."

As to plaintiff's alternative classification, both Mr. Riekes and Mr. Dickey testified that some of the Liberty Bells, demijohns, and barrels

were sold and used as bases for lamps. In addition, plaintiff submitted two brochures of lamp manufacturers which pictured the Liberty Bells and barrels being used as bases for lamps. This evidence, however, does not rebut other evidence which establishes that the Liberty Bells, demijohns, and barrels are more properly described as "[a]rticles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, household articles, and art and ornamental articles, all the foregoing not specially provided for: * * * [o]ther glassware," under items 546.52, 546.54, 546.56, or 546.59, TSUS. Accordingly, Customs' classification of the barrels is sustained.

### CONCLUSION

In view of the foregoing, it is the determination of the court that, as to the glass lids, glass domes, Liberty Bells, demijohns, and barrels, plaintiff has not rebutted the presumption of correctness that attaches to the classification by Customs. Accordingly, the *glass lids, glass domes, Liberty Bells, demijohns,* and *barrels* were properly classified as "[a]rticles chiefly used in the household or elsewhere for preparing, serving, or storing food or beverages, or food or beverage ingredients; smokers' articles, household articles, and art and ornamental articles, all the foregoing not specifically provided for: * * * [o]ther glassware," under items 546.52, 546.54, 546.56, and 546.59, TSUS, depending upon the value of the article.

As to the glass parts of the *Yard-of-Ales* and the *glass liner trays,* it is the determination of the court that plaintiff has successfully rebutted the presumption of correctness, and that the imported glass parts of the Yard-of-Ales and the glass liner trays are properly classifiable as "[a]rticles not specially provided for, of glass," under item 548.05, TSUS.

Judgment will issue accordingly.